Thank you. Have a seat, please. Mary, would you call the case? Case number 13-1075, the Estate of Nardoni. All right. Thank you. Counsel, if you both approach the bench and identify yourselves, we'll get started. Good morning, Your Honors. George Apostolidis on behalf of Appellant Standard Bank and Trust Company. Good morning. Leonard LaRose. I represent the appellee of the Estate of Dennis Nardoni by Michael Hughes, the independent executive. All right. Well, thank you. We'll start out with 15 minutes a side, and the appellant can reserve time for rebuttal if you wish. Yes, please. I'd like to reserve five minutes. Very well. Whenever you're ready. May it please the Court. Good morning. My name is George Apostolidis, and I'm here before you today as counsel for the appellant and the claimant in the Nardoni Estate Standard Bank and Trust Company. This Court should reverse decisions by the probate court to, one, grant the cross motions for summary judgment filed by the executor of the Nardoni Estate, two, deny Standard Bank's motion for summary judgment, and three, deny Standard Bank's motions to reconsider. The probate court committed reversible error with regard to both of Standard Bank's claims in the Nardoni Estate. First, the claim relating to the loan to Oster Acquisitions, and second, the claim relating to the loan of Cap Estate Corporation. First, with regard to the Oster claim, the probate court erred in finding, one, that Mr. Nardoni's death revoked his personal guarantee, and two, that the execution of a substitute note after Mr. Nardoni's death made in the same amount of the indebtedness as the two earlier notes which Mr. Nardoni had guaranteed was a novation, which extinguished the guarantee liability of the estate. Second, with regard to the Cap Estate loan, the probate court erred in finding, one, that Mr. Nardoni's guarantee was limited to $300,000, and two, that even so, Mr. Nardoni was discharged from his liability due to what the court called the commercially unreasonable actions of the bank. The standard of review is de novo. This case is, at bottom, a contract case. The guarantees that Mr. Nardoni executed, along with the associated loan documents at issue, are the operative documents. They're the contracts that this court is to interpret. As this court knows, guarantor liability is determined from the guarantee contract, which courts interpret under general principles of contract interpretation, Bank of America v. Scholson, 305, Illinois Appellate Court, 3rd, 941, 1st District, 1999. Guarantee contracts must be interpreted in a manner that gives effect to all of the provisions, and the court must construe the contract as a whole, as it would in construing any contract. It has to read each term in light of all of the others. The language of the guarantees governs here, and they show clearly why this court should reverse the probate court. I'd like to structure my argument by dealing with the Oster guarantee first and then the Kappa State guarantee. I think it will be easier for the court to follow that way, if it pleases the court. Mr. Nardoni was one of three members of an LLC called Oster Acquisitions. Oster was a party to two loans from Standard. One in 2006, one in 2008. The 2006 loan was for $2 million. The 2008 loan was for $4 million. From time to time, the terms of those loans were changed, extended, additional credit was extended, such that by the time Mr. Nardoni died in August of 2010, the amount due and owing on the two notes by Oster was approximately $7.2 million. Those two loans had the same loan number, 4033709. The first loan had a 001 at the end, so we'll call it loan number one. The second had a 002 at the end, loan number two. Mr. Nardoni executed personal guarantees in connection with both loans. The key language in those guarantees is identical. It's at page number C01494 of the record. Here's the key. The guarantees are absolute and unconditional. That's in the first line of the guarantee. There are no conditions associated with these guarantees. Second, indebtedness is defined as the principal amount outstanding arising from any and all debts, liabilities, and obligations of any nature and form that Oster owes Standard. Indebtedness includes without limitation, and I quote, future advances, loans or transactions that renew, extend, modify, refinance, consolidate, or substitute these debts, liabilities, or obligations. There's then a section which says that the guarantee is continuing, and there's a section called duration of guarantee. The duration of guarantee section has language which is important, too. That language is, this guarantee shall bind guarantors' estate as to the indebtedness created both before and after guarantor's death or incapacity, regardless of lender's actual notice of guarantor's death. How did the consolidation affect that? The consolidation did not affect the obligation of the estate on those guarantees, and the reason is that the third note, which we'll call loan number three, which was executed about two weeks after the independent executor was appointed and about three and a half months after Mr. Nardone died, was simply a substitution of the two existing notes. As of the date that third note was executed, which, by the way, had the same loan number with a 003 at the end, the amount of indebtedness was approximately $7.12 million. That was the amount owed on the two notes. The amount of the third note was that exact amount. Was the consolidation a new country? It was not a new contract, because under the law, you would only have a new contract which would extinguish a guarantee if the old indebtedness was satisfied, which it wasn't. The old indebtedness was simply transferred from the old notes to the new note, and because the indebtedness simply moved from the old to the new, the guarantee remained in full force and effect. How about the issue of the impairment of the collateral? The issue of the impairment of collateral is for the cap-estate loan. It doesn't really apply to the Oster loan. Well, let's stay on the Oster loan for just a second, then. Let me ask you this. On the 2006 loan and on the 2008 loan, were there three guarantors? Yes, there were three guarantors. And they were? They were the three members of Oster, which were Mr. Nardone, Paul Duggan, and Thomas Bastunas. And were their guarantees essentially similar in their terms? Yes, the guarantees were all, I think, identical. They all were unlimited guarantees, and they all contained the language that all of these guarantees have, which is essentially that the bank does not have any obligation to pursue one guarantor or another guarantor. So on the 2010 loan, it's your position that the guarantees of Nardone that were written on the 2006 loan and the 2008 loan binds him to the 2010 loan. That's correct. Then why did you get new guarantees on the 2010 loan for the other two guys if you didn't need them? It is common practice at the bank to obtain fresh guarantees, even if the old guarantees are still good, simply as an acknowledgment by the guarantors that their guarantees are in connection with the new loan. Well, can't that be interpreted that people don't do things unnecessarily? Can't that be interpreted to mean that you got new guarantees because the old guarantees were extinguished? No. You don't do something for nothing. Well, the way this works, as I understand it… I mean, you got two new guarantees instead of three guarantees. So, you know, I mean, if you just look at it from, you know, just looking at it, you say, well, wait a second. You know, you got a new loan, and they didn't rely on the terms of the 2006 and the 2008 guarantees. They didn't have enough confidence that those survived the new loan, so they went out and got new guarantees. But you don't have a new guarantee for Nardone. What I would say to you is that the premise of your question is not supported by the record. The concept that the bank didn't have confidence in the earlier guarantees, and that's why it went out and got new guarantees. What happened here was with the loan, with the new note executed in 2010, there's a loan package, and there's a series of documents that are executed, and the guarantees are just routinely in that package. There's nothing in the new guarantees given to Mr. Bastunas, or executed by Mr. Bastunas and Mr. Duggan, which says that those guarantees in any way replace or supplant the guarantees that they had executed earlier. So your answer to my question is, well, it's common practice to do that, but we didn't really need them. That's right. That's your answer? That's my answer. All right. Go ahead. Did you indicate that the third loan is really the same as the second? Yes. The principal amount was identical to what was owed on the… The purpose of executing the new loan was to give a more favorable loan to Oster. Oster… Well, I thought you said it was this exact same amount of money. It is the exact same amount of money. The collateral changed, and the repayment terms changed. So that's why the new loan was executed. So when that new collateral was used to support the loan, how much was it worth? The new collateral on the Oster loan? Yes. I do not know. But like the other collateral on the other loan, the bank refused to either give it back to the estate or use it to satisfy the loan. Isn't that true? There's nothing in the record which suggests that the bank in any way with regard to the Oster loan held any collateral. All right. The other one. The other one, that's the commercial unreasonableness question that Judge Gordon raised, so we can talk about that when we get to Cap Estate. Okay. Going back to the Oster loan, the probate court on the initial motion for summary judgment of standard that was denied and the cross-motion for summary judgment of the estate which was granted found in its order that Nardone's death revoked the guarantee. Mr. Nardone died in August of 2010. The guarantees had been executed in 2006 and 2008. The probate court found that under certain cases, and I'll name them for you, a 1932 First District case, Commonwealth Trust and Savings Bank v. Hart, 268 ILAP 322, an 1888 Second District case, Home National Bank of Chicago v. Waterman, 30 ILAP 535. Are these cases in your briefs? They are. You don't need to give us the cites. Okay. Thank you. And Gay v. Ward, which was a Connecticut case. Based on those three cases, the probate court found that the death of Mr. Nardone revoked his guarantee. But there's lots of law since those cases which says what I had led off my presentation with, and that is that guarantees are to be construed by the language of the contract. The intent of the parties will be dictated by what the guarantees say. In this case, the guarantees that Mr. Nardone executed say explicitly, as I mentioned before, this guarantee shall bind guarantor's estate as to the indebtedness created both before and after guarantor's death or incapacity, regardless of lender's actual notice of guarantor's death. None of the cases that the probate court relied on in finding that the death of the guarantor revoked the guarantee had guarantees with language like that. None of them. So the question for the court is what is the intent of the guarantee? The intent of the guarantee is contained in its language, and that is that Mr. Nardone's death does not, in fact, revoke the guarantee. Well, what was the trial court's, didn't it have some indication that because the liabilities were replaced for the new loan without obtaining the consent of the independent executor, he had some question about that? That is the second argument. It is the second? That's what comes next. That's the novation argument. Okay. Okay? So this is what the trial court found originally on the cross-motion for summary judgment. The order says explicitly death revokes the guarantee, and the transcript of the argument says he doesn't even get to novation. Standard then filed a motion to reconsider, and in the order on the motion to reconsider, the probate judge said, beyond the fact that the death revoked the guarantee, I am also finding that the execution of the December 2010 note number three was a novation, which relieved the guarantor of his obligations on the first two notes, and therefore the Auster claim should be denied for that reason as well. So by the time the motion to reconsider had been decided, now that the probate court had two grounds for finding in favor of the executor, there's a question as to whether or not on a motion to reconsider filed by the party that lost, the probate court could come up with another reason why the party that won should won, but put that to the side for the moment. Well, we're reviewing everything to no vote. Right. So what about that? Let's move on to the novation argument. The execution of the third loan is not a novation. I'm sorry to hold you up. Sure.  Did you cite a case? I understand that you distinguished the cases that were cited on the other side, but did you cite a case in which it was held that a guarantee was not extinguished upon the death of the guarantor? No. There just isn't one? Well, there are plenty of cases in which there's consideration of whether or not a guarantee outlives the death of a guarantor, but I don't believe there are any cases in the briefing which say … We're relying on the language of the guarantee. That's right. We're relying on the language of the guarantee and the essential law in construing guarantee contracts that the language is what dictates. The language is how you decide what the guarantee contract means. Can I go back to novation? Yeah. Thank you. Okay. As the court knows, a novation occurs when a valid new contract or obligation is created and a valid existing contract or obligation is extinguished. That's in the U.S. Fidelity v. Klein case. That is not what happened here. The probate court premised its decision that this was a novation on two cases, McLean v. Brokaw, an Illinois Supreme Court case from 1988, and Cincinnati Insurance Company v. Leighton, a Seventh Circuit case from 2005. But both of those cases are wholly distinguishable from this one. In McLean, the bank had a guarantee with the guarantors who were a husband and wife, Mr. and Mrs. Brokaw, and they guaranteed the debt of their son in his business. As the son's debt increased, the Brokaws executed new guarantees. The last guarantee the two Brokaws executed was for $200,000. Then the bank requested the execution of a new guarantee for $250,000, but only Mr. Brokaw signed it. Mrs. Brokaw didn't sign it. The bank pursued Mrs. Brokaw, and the court found that Mrs. Brokaw was not a party to the $250,000 guarantee, and therefore she could not be liable on it. Well, that is not what happened here. Here the guarantee of Mr. Nardone remained in place. It was never replaced by a later guarantee. McLean does not provide a basis for the probate court's holding in favor of the executor. But what about Cincinnati Insurance? Well, that case doesn't support a finding of a novation either. The key to that case is language at page 888 of the opinion. There the Seventh Circuit distinguished the Cincinnati case from two Illinois State Appellate Court cases, Champaign National Bank v. Babcock, 273.113.292, and United States Fidelity and Guarantee v. Klein, a 1989 case. In those cases, the Illinois Appellate Court found that no novation had occurred. Why? Because those cases were based on the operative document language, which is what this court should do as well. In Babcock, the Fourth District noted that the guarantee at issue had the following language. No release of any person primarily or secondarily liable shall affect the liability of any of the undersigned hereunder. In Klein, the First District noted that the indemnity agreement said that the indemnitor, quote, shall not be relieved of liability hereunder by any change, addition, substitution, continuation, renewal, extension, successor, or new obligation. So what does the language say in these guarantees? In the indebtedness paragraph, the language of this guarantee is that indebtedness includes future advances, loans or transactions that renew, extend, modify, refinance, consolidate, or substitute those debts, liabilities, or obligations. And that's what note number three was. You could put note number three under virtually any of those descriptions and find that it falls within the language of Mr. Nardone's guarantee. It could be considered to be a renewal. It could be considered to be an extension. It could be considered to be a refinance. It could be considered to be a consolidation. It could be considered to be a substitution. All of those under the guarantee Mr. Nardone signed constitute indebtedness that his guarantee guarantees. This is not a novation. There is not any new debt. Loan number three was loan numbers one and two. In addition, the court should note the State Bank of Lake Zurich versus Winnetka Bank case, which was cited in the bank's reply. There, the second district noted that where a note renews another note and is not in payment of that note, the renewal does not extinguish the original debt or change the debt. The key is no money changed hands when note number three was executed. It simply took the existing indebtedness on notes one and two and put it into one note. If the court doesn't have any other questions, I'm going to move on to the Kappa State loan, given my time. Okay, thank you. Now, Kappa State. Kappa State was a different company than Oster. Mr. Nardone was the president of Kappa State, and actually the executor was one of the officers and directors of Kappa State. In August of 2009, Mr. Nardone, on behalf of Kappa State, executed a $1 million promissory note with Standard Bank. He also executed a commercial guarantee, which had substantially the same language as the commercial guarantees we looked at in the Oster loan. Same language with regard to indebtedness. Same language with regard to continuing guarantee. Same language with regard to the duration that the guarantee shall bind the guarantor's estate as to the indebtedness created both before and after the guarantor's death or incapacity. There's some other language in that agreement which impacts the Kappa State claim, though. In guarantor's representations and warranties, there's language that the provisions of this guarantee do not conflict with or result in a default under any agreement or other instrument binding upon guarantor and do not result in a violation of any law, regulation, court decree, or order applicable to guarantor. In addition, the guarantor in that guarantee waived any and all rights or defenses based on suretyship or impairment of collateral. The contract language, the guarantee language, is that the guarantor waived defenses based on impairment of collateral, and that's important for the Kappa State loan, and we'll get to that in a moment. Mr. Nardone also executed two other noteworthy documents, a control agreement which gave Jackson Boulevard Capital Management a hedge fund in which Mr. Duggan and Mr. Nardone had an interest, the authority to hold stock and distribute the proceeds of the stock, including dividends to standard, and a business loan agreement. And you're going to hear a lot about the business loan agreement from the counsel for the executor. The business loan agreement says in a section called guarantees, prior to disbursement of any loan proceeds, the borrower Kappa State was to, I'm sorry, I'm not quoting it, but under the guarantee, I apologize, under the guarantees section, the borrower Kappa State was to furnish executed guarantees of the loans by Nardone in an unlimited amount, Bastunas in the amount of $700,000, and Duggan in the amount of $700,000. So what you have is you really have a conflict in the documents. The guarantee of Mr. Nardone says that his guarantee is absolute and unconditional. The business loan agreement says that standard will not disperse the loan proceeds until it receives the three guarantees, the Duggan, Bastunas, and Nardone guarantees. And why is that a conflict? It's a conflict because, as you know, Mr. Duggan never executed a guarantee. So what the executor claimed in the probate court, and the probate court agreed, was that because Mr. Duggan never executed a guarantee, that impaired Mr. Nardone's ability to seek some type of contribution from Mr. Duggan, and therefore his guarantee was limited to only $300,000. And the probate court came up with that figure by taking the $1 million in the note, which was guaranteed by Mr. Nardone, and reducing it by the $700,000 of the Duggan guarantee that the bank never received. As you know, courts are supposed to try and harmonize provisions of documents, even if they may be in conflict. Can this court harmonize the language of the business loan agreement, that the loan is conditioned on obtaining the three guarantees, and the language of the guarantee, which says that the guarantee is absolute and unconditional? Yes, it can. And because it can, it should. The way that the court can harmonize those provisions is by finding that the provision of the business loan agreement, by which the bank was to obtain the three guarantees, was for the benefit of the bank. It was not for the benefit of the guarantors. It was for the benefit of the bank. I'm going to ask your opponent the same question. When a court finds that actions were commercially unreasonable, isn't that really the actual question that the court shouldn't be really making? What do you think? I know you want summary judgment, and obviously it was denied, and the other states secured that. But as a matter of law, is that what the court said, that the actions of standard were commercially unreasonable? The probate court found that the actions of standard were commercially unreasonable. Yes, my question is to you. Isn't that generally a question of fact, whether conduct is unreasonable or not, commercial or otherwise? Yes. So you wouldn't be entitled to summary judgment either on that issue, would you? What I would say to you is there are lots of cases where both sides file summary judgment motions and trial courts say, we're having a trial. Where even both sides agree, or at least take the position in their papers, that there's no genuine dispute of material fact, and trial courts say, sorry, we're having a trial. Is that something that could happen here or should happen here? What I would say to you is there are lots of facts which these parties dispute, and the bank's position is that remand would be appropriate in this case if the court finds that that's what should happen. Now with regard to the commercial unreasonableness, that's a little different argument than this $300,000 argument. Right. So let me turn to that one. I'll turn to the commercial unreasonableness. I'll come back to the $300,000 reduction. I think the facts here are important. It really goes right to what Your Honor is saying. Jackson Capital was a hedge fund. It owned positions in multiple companies. Gardoni had a stake in Jackson. In early 2011 or late 2010, Jackson Capital was shutting down. Jackson Capital was holding positions in certain companies which belonged to Mr. Gardoni, but for which Standard had the control agreement. And the control agreement said that Standard was entitled to any dividends or other distributions relating to those stocks. When Jackson shut down, because it had the control agreement, it sent the stock to Standard. And Standard said, you know what, this stock is still titled in Mr. Gardoni's name. It doesn't do us any good because if there are any distributions made, because Jackson doesn't exist anymore and the control agreement doesn't apply anymore, if there are any dividends or distributions, they're to go to Mr. Gardoni, to the estate. And so Standard took an action that it is entitled to take under the loan documents. And that is, it sent them back to Jackson and said, hey, before you shut down, retitle these in Standard's name. And it did. And they did. Now, here's what's important that the probate court completely ignored. The two companies that are at issue here, National Bank Shares and ePay, were privately held companies. And they were privately held companies with no market. How do you know that? It's in the record. I apologize. At Record on Appeal, page number C01586, there's a letter. And it's from Jackson Capital to Mr. Gardoni. Now, he had already died. It's addressed to him and his wife. And it says, you are receiving shares in stock in our two largest positions, National Bank Shares and ePay. We assume both positions will be liquid in the next 18 months. These were not stocks for which there was a market. So the executor's position that Standard acted commercially unreasonably in holding these and refusing to give them up is belied by the record. There is nothing in the record before this court. So that really is sort of like a question of fact. That is sort of a question of fact. I would agree with you on that. But there is nothing in the record before this court. It's somewhat surprising that the bank would have allowed that to be pledged as collateral if it wasn't marketable. It's kind of a, what are you supposed to do with it if you're the bank and you foreclose on the collateral? Exactly what it did, which is hold it and wait until there's a market for one of the companies, which, though this is not in the record, it turns out there was later because National Bank Shares went public. Now, that's not in the record because that happened after the decision in the probate court, but I'll just tell you, and this may be another fact question. I might have to stop you there. If it's not in the record, I don't think that's fair to either side. Fair enough. But what the bank should have done is exactly what it did. Hold the stock until there's a market for it and then liquidate it, which it did. The bank is still holding the ePay shares because there is no market for that. It doesn't have the National Bank Shares anymore. Maybe I'm going to backtrack from what I just did because one of the questions I was going to ask was, what's the status of those holdings now? And counsel can disagree when he steps up. The bank is holding the ePay shares. The National Bank Shares stock were liquidated. For how much? Approximately $250,000. Bless you. And with that, thank you. I'm going to ask that you wrap up and let you come back afterwards. Thank you very much. For the reasons that have been set forth in the argument thus far, the court should reverse the finding of the probate court, find with regard to the Oster loan, that not only was there no revocation of the guarantee by Mr. Nardone's death, but also that there was no novation and standards claim with regard to Oster should stand. And then with regard to Kappa State, the court should find, number one, that the guarantee was not limited to $300,000. And I will come back to that on rebuttal because I want to flesh that out a little bit more. And number two, that there was no commercially unreasonable behavior on the part of the bank, so its Kappa State claim should also stand.  Thank you, counsel. Is it commercially unreasonable to hold on to something that doesn't have a market value? May I, please? Leonard LaRose again, I'd be happy to. Start there. Sure, I'd be happy to. In this case, the trial court decided the issue of commercial unreasonableness based on the specific facts of this case. Now, Kevin Boyle testified. Kevin Boyle is the assistant vice president of Standard Bank, and he's also been a commercial loan officer for years, and he testified that he was the point person on all these loans, and he was involved in the origination and negotiation of all these loans. What he testified to, there was no testimony that any of these stocks were of no worth, and quite simply, it would make no sense for a commercial bank to secure a loan. With securities, they're arguably worthless. It doesn't make any sense. What he did testify to, that in the two years that Standard Bank held these stocks, he never determined what the value of the stocks were. He never, to his knowledge, no one else at Standard Bank had ever determined what the value of the stocks were, and the facts of this case are so different than the typical commercial case for this reason. In January of 2011, Paul Dugan, who was a principal of Jackson, what he did is he sent the stocks to Standard Bank, and the e-pay and the NAVA were vested, title was vested in Dennis and Claire Naudoni's name and also CAB Estates. Now, at that point, the record's clear that Kevin Boyle accepted them around January 14, 2011, and what he did is he sent it back to Jackson and said, we didn't ask for this. Four days later, it's undisputed that the executive of the estate sent a written communication to Mr. Boyle and said, if you want to send those stocks to us, we will negotiate them, we'll try and sell them because we want these stocks applied to the debt. Now, at that point, that didn't happen. In March of 2011, what happened is that Mr. Dugan at Jackson sent a letter to the transfer agent, and he stated that they were erroneously issued initially, and he requested that the NAVA and the e-pay stocks were issued in the name of Standard, and they were. So when he delivered them in mid-March of 2011 to Standard Bank, this time Standard accepted them. In March of 2011, the title to the stock was in Standard Bank. The possession was in Standard Bank. They had the control, and what did they do with them? They took the stocks, notwithstanding the executor's request to try to sell these stocks to apply to the debt, and they put it in their vault. So they had title, control, and in the trial court, at the hearing on the motion for summary, the court inquired over and over again, why don't you sell the stock and apply it to the debt? You just can't come to take possession of the stock and do nothing with it. But didn't the provisions of the loan permit that? The provisions of the loan, look, the question becomes, at what point does this cease being collateral? At what point do these stocks, you know, Standard is treating this stock as their own. So is this really collateral? Because it's not a situation where title was in Nardone's name subject to a lien in Standard Bank. This is a situation where Standard Bank somehow, you know, Standard Bank took title to this, and under provisions of the Code and the applicable law, it was our position that once a bank takes possession and title, especially in a situation like this, they have to do something with it. They can sell it and apply it to the deficiencies. So was that the primary basis, then, of the court's decision that that was commercially unreasonable at that point? What the court found was commercially unreasonable, in my opinion, was that the court asked over and over, what are you going to do with the stock? And the reply from Standard Bank at that time, we don't have to do anything. And the court's next question, again, repeatedly, is why don't you simply sell the stock and apply it to the debt, which is what the executor asked. And they refused. And they refused. And it's undisputed, at the time that Standard initially took title and possession of the stock, according to the account recaps which were furnished by Jackson, the value of the pledged securities exceeded the debt. And Kevin Boyle testified to that in his deposition. So that issue is undisputed. What happened over the next couple of years while it was languishing in the vault is a different issue. My understanding, the court asked what eventually happened. My understanding that I heard, and it's not in the record, but I heard that the stocks were sold, and I thought $400,000 was realized. Be that as it may, though, it is undisputed at the time that Standard took title and possession of the stock, the value of the securities, the value of the pledged securities exceeded the debt. And that was borne out in the record by Kevin Boyle's undisputed testimony and also by the records that were furnished by Jackson Capital. So the court found it wasn't so much an impairment of collateral issue that the court based its decision on. It was commercially unreasonable for Standard Bank to accept title and possession of the stock and basically do nothing with it for several years. Okay. Do you want me to stay on CAP or do you want me to start with Oster? It's up to you, Constable. Okay. I'll start with Oster. And for the record, we would request that the trial court's rulings for summary judgment on both the Oster and CAP estate loans be affirmed. Let me just ask you, let's talk just for a second. About this obligation at the outset to have three guarantors. Okay. We're talking, okay, this would be on CAP then? Yeah, before we leave CAP. Sure. There was a business loan agreement that Kevin Boyle testified to was a, what he called a typical document that Standard Bank requires to sign a loan transaction similar to the one at issue. It was considered a related document in the guarantee. When Nardoni's guarantee is viewed, I think it was the first sentence that says it's a guarantee of full payment and satisfaction, but it's also to be viewed in terms of its performance in light of the related documents. And one of the related documents that it referred to was specifically this business loan agreement. Now, under the business loan agreement, the business loan agreement stated that prior to the disbursement of the loan, the borrower will provide guarantees, signed guarantees from Nardoni, from Bastunas, and from Paul Duda. Now, Kevin Boyle testified that Mr. Nardoni, this was a significant issue. Those were Kevin Boyle's words. This is a significant issue to Mr. Nardoni to have Bastunas and Dugan guarantee these obligations to the extent of $700,000. Kevin Boyle also testified it was Mr. Nardoni's requirement that these guarantees be structured in this way. And it was also Mr. Nardoni's, it was his intent specifically to make sure that these guarantees, which were guaranteeing the capital estate loan, was also guaranteed by these two individuals to the extent of $700,000. What happened in that case is Dugan never, it's undisputed that Dugan never guaranteed the loan. So there's two cases that we cited, the State Bank of East Moline and the Mount Prospect State Bank. And the first issue that the Supreme Court addressed was, was the guarantee in those cases contingent on all limited partners signed? Now that case was even more remote because in that case it didn't, this issue was not even reduced to writing. You had a partner verbally telling the bank president, I don't want to be on the book any more than my contribution. And then the bank president telling him verbally in response, well then we'll get guarantees from all the limited partners. That's not, but that didn't happen. The bank disbursed the loan in any event. And in that case, the bank's argument was pretty much the same argument that Standard Bank has today, that there was no condition that appeared in the guarantee. If you look at the plain guarantee, none of, you know, there was no guarantee or no provision with respect to this agreement that all limited partners had to sign the guarantees. The bank further said the limited partners didn't impose this condition and the bank also stated that the bank didn't impose this condition. Well, I noted that you cited those two cases for the prospect of the fact that the guarantor has the right to rely on, it's a mutual thing, and that the guarantor has the right to rely on the requirement that there be X number of guarantors. The reason why I directed you to that topic is I wanted to ask you, how does the fact that the guarantees, or if it's another document you can correct me, give the bank the right to release a guarantor? So if, on the one hand, based on these cases, Mr. Nardone has a right to rely on the fact that there will be two other guarantors, but the documents give the bank the right to release a guarantor. So how does that square with the original contention? Well, that goes to the second point of the Supreme Court address. Even if the guarantee was conditional by reason of the fact that not all three guarantors, their signatures were not obtained, can the bank basically waive that condition and advance the loan? And the Supreme Court said no for two reasons. Number one, by doing so, the bank would materially increase the proportionate liabilities of all the limited partners. In this case, it would be the two guarantors who signed this, Nunes and Nardone. Well, I understand that in that case, but in the case that's before this Court, wouldn't it be a little bit different in that the documents provided for that, that the documents provided that the bank could release a guarantor? Correct, but still, one last thing. The other reason was that by not having Dugan sign, and this is what the State Bank of East Moline, the Supreme Court, cited, is Nardone loses his right of contribution against Dugan. So if the loan was funded, and let's say that Standard Bank wanted to release both of them, would they do that? Yes, but the point is if Dugan had signed the guarantee, Nardone has a right of equitable contribution against them. So we're not arguing that the bank cannot release Dugan or whoever. Just like they could go out and if the loan falls into default, could they go and do they need to sue all three guarantors? No, they can choose. But did this language appear in the loans that were in the Supreme Court case and the Mount Prospect case? The language allowing the release of a guarantor? I believe so, because these loans, yes, I believe so. Because the court addressed that eventuality? Did the Supreme Court address that? The Supreme Court specifically addressed these two issues. Was it conditional? And if it was, could they nonetheless fund the loan? Or release the guarantor? Right. And what that case was specifically decided on the grounds was it would increase, materially increase the proportionate share of the people who did sign the guarantees. And if you don't get all the signatures of the guarantee, then in that situation, the signers are going to lose their equitable right of contribution. And then even in the Mount Prospect case, that situation dealt with, you know, it was the same situation. The language of, you know, this condition did not appear specifically in the guarantee. However, it appeared in the cover letter. My point that I argued before the trial court and I'm arguing before this court, is we don't have a situation now where we need extrinsic evidence. This is not a case where we have to decide this on the facts, because we have this business loan agreement whereby, you know, what specifically was agreed to was put in writing. It's not like someone said something and we have a cover letter. And we have undisputed testimony from Kevin Boyle that this was a significant issue to Mr. Nardone. Well, that's extrinsic evidence. Yes. If you wish, I could go to the – go over the – Go ahead. Okay. I stopped you, so go ahead. All right. Would you want me to go to Cap or to Oss or whatever the – It's your presentation. Okay. Go ahead. Let me start – let me go back to Oster. As was stated, there was three loans. Loan one was dated May 22, 2006, and it's undisputed that that loan was guaranteed by the three members of Oster. It's undisputed that the three members each signed personal guarantees with respect to this loan. And it's also undisputed that the bank from time to time would enter into change-in-terms agreement with the borrowers where they would vary from time to time the terms of the loan. Now, as of December 5, 2010, according to the record, the balance at that time was about $3.9 million. With respect to loan two, which is a separate loan that dealt with the new infusion of money, that was signed in May of 2008, and it's also undisputed that the three members of Oster signed the guarantees. The note was signed by the three members of Oster, and it also included a change-in-term agreement, which specifically changed that separate loan. Now, according to the loan history, as of December 5, 2010, the amount due was about $3.1 million. Then Mr. Nardone died in August of 2010. Now, the letters of office issued to Mr. Hughes on November 22, 2010, and a couple weeks later, on December 5, 2010, this is when loan three was originated between Oster, the surviving members of Oster, and also Standard Bank. Now, it's undisputed that the note was signed by two members of Oster, Dugan and Bastunas. It's also undisputed that only Dugan and Bastunas signed written guarantees with respect to this. It's undisputed that the collateral that secured loan number three differed from the collateral under loans one and two. At his deposition, Kevin Boyle testified that on December 5, 2010, the proceeds of loan three were used to pay off in full the balance due under loans one and two. He also testified that after these proceeds were applied, the balance of loan one was zero, the balance of loan two was zero. He testified, and it's undisputed, that he was aware that Mr. Nardone passed because he was at the funeral, as was Mr. Dugan. But most importantly, Mr. Boyle testified, and the record is clear, that Mr. Boyle did not request the executor to sign any guarantee with respect to loan three. The record is clear that Mr. Boyle testified he had no knowledge that anyone at Standard Bank ever notified the executor that loan three was going to be originated and funded. Now, it's also clear that they were aware that Mr. Hughes was acting as executor at that time. In the record, there is a document. It's an LLC resolution to borrower where Mr. Hughes was signed by Dugan and Estones. There was a line also for Mr. Hughes to sign as independent executor of the estate. He never signed it, and it's undisputed that it was never presented to him. The reason I think that's important is because you have a situation where after Mr. Nardone's death, what happened is Standard Bank made the decision to go forward and create this new loan with new collateral, with new terms, without one notifying the executor or requesting him to sign guarantees or to join in, in any fashion. This was a decision that Standard Bank made. They're a commercial bank. They make decisions like this day in, day out, and they've made decisions like this for decades. What they did is they went to Auster, they discussed the origination of this new loan with new collateral and new terms after Mr. Nardone's death. Now, the case that I've cited, which is a 1932 case, but it's still the first district case, it stated that the guarantor's death operated to revoke the guarantee, and the guarantor's estate, the estate of Nardone, is not liable for obligations created after the guarantor's death. Now, does this apply to all guarantees? No. And the commonwealth case specifically distinguished two types of guarantees. There's a guarantee where consideration is paid all at once. That's not the commonwealth scenario. It talked about guarantees which were continuing, that envisioned a series of transactions, a number of transactions happening in the future. Now, what the bank argued in that case is when the bank accepted the renewal notes in the commonwealth after the guarantor's death, they said no new indebtedness was created. That's the same argument that's made in the trial court. But in probate, the probate court has certain duties, and there's a strong public policy and a great deal of case law about settling estates in a timely fashion. If you have a continuing guarantee that theoretically can go on ad nauseum, where's the cutoff? When does the liabilities of the guarantor stop? Is it that Nardone signs a guarantee that says, I guarantee loans one and two and anything thereafter? That's the same language in the commonwealth. Any renewals or extension thereafter. In the first district in that case, there has to be a cutoff, and the cutoff is that death operates as a revocation. Now, does it terminate the liability? That was a little bit of confusion in the trial court. The answer is no. The reason why commonwealth, I think in my opinion, adopted the Supreme Court's of Connecticut language is at death to prevent this ad nauseum liability and to determine what the liabilities are. The liabilities are determined at death. So it's clear that when Mr. Nardone died, there were liabilities due at that time. We're not disputing that. The issue then becomes, can he be held for liabilities created by the remaining members and standard bank to which the executor is not even a party and has not even been notified? And commonwealth said no and the trial court said no. The liabilities are determined. And what commonwealth said is, you know, the bank at that time can do certain things. They can protect themselves. One, they can file a claim against the estate. The estate was open. They knew it was open. They could have filed a claim.  the independent executor and said, we're thinking about, you know, we're thinking about doing this new transaction. And at that point, because who knows? I mean, at that point, maybe the executor says we'll go along with it, but maybe he doesn't want to. We had a lot of predators in this estate at that time. And he has to be mindful of all these other predators. But at some point, the liabilities under this guarantee, they have to cease. We think that this law is also in accordance with the novation. It can't go on indefinitely because otherwise these states will never settle. With respect to the second issue on novation. The trial court held that the acceptance of the December 5, 2010 note superseded Mr. Nardone's prior obligations and therefore released him. Now, in this matter, we cited the McLean County Bank, which again is a Supreme Court case and the Cincinnati case. In the McLean case, which was a Supreme Court case, you know, the counsel already went over the facts. But what the Supreme Court considered when it was looking at the new guarantees that were furnished by the parents of the borrower, it noticed specifically that the father signed the $250,000 note. The mother did not. The bank claimed at that point that a novation and a discharge of liabilities only occurs when a creditor agrees to substitute a new debt for an existing one. And what the Supreme Court noted was there's a difference between additional security and a substitution in satisfaction. And if a substitution is found, then that is considered a novation and the prior obligations are extinguished. And in this case, you know, again, we have the loan three, which is a separate obligation. It's a new loan. Mr. Hughes, the independent executor, was not consulted. He was not asked. He wasn't notified that this was going on. So how does the estate protect themselves when the estate is open and the bank renegotiates the note on new terms with new collateral? There's no evidence in the record that he was aware of it. And in this situation, these cases quite clearly say that this new obligation, in this case loan three, was a separate new obligation with new collateral and it substituted and extinguished the prior ones, which is consistent with Kevin Boyle's testimony. When he talked about these payments were principal payments which were applied to the outstanding balances of loans one and two. Those were his words. It's consistent with the loan histories that were provided by Standard Bank. They were right in the loan histories on December 5th. When they showed the payments from loan three, they classified them as a principal payment. It is entirely consistent between the records and also the testimony that this was a principal payment from a new loan that extinguished the prior obligations. And quite frankly, Nardone's guarantees which related to loans one and two did not extend to this new obligation created after his death by Standard Bank. All right, counsel, I think we're going to ask you to wrap up then. Okay. Okay, we would just, if the court doesn't have any further questions, then we would just ask that the judgment of the trial court be affirmed. Thank you, counsel. Thank you. Thank you. All right. So what is it, five minutes, counsel? Yes. All right. I'll be as brief as I can. What I'd like to do on rebuttal is address the Auster claim first since we seem to be going in that order and then the Kappa State claim. With regard to Auster, I just have a couple of comments. Number one, counsel for the executor stood here and said this was a new loan, a new loan. He said it over and over. He did not address the fact that the principal amount due on loans one and two and the principal amount due on loan three was identical. He also did not address the fact that no money moved. This was simply taking the two old loans and replacing them with the new one. This wasn't a fresh loan. There was no fresh money that went to Auster. There was no capitalization that had happened here. This was simply taking two documents and turning them into one. Second, he raised the issue of where does the probate estate close, where does the probate estate cut off. That's it. That argument should be rejected by the court. In any estate, whether it's a probate estate, a bankruptcy estate, or any other kind of estate, there's a claim process. And claimants file claims just like Standard did in this case in February of 2011. It filed two claims in the Nardoni estate. That's the value of the claim. That's the claim that is to be liquidated, and that's the claim to which the independent executor objected. The concept that you can't close a probate estate while you've got claims outstanding is, we believe, a red herring. It's pretty straightforward. When the claim is filed, the claim is to be fixed based on what's filed, and that's how the probate estate would pay out. Well, but how would that work with a guarantee, though? Because a guarantee isn't a claim. It doesn't become a claim until they foreclose on a guarantee. So let's say you're in the six-month claim period. Is it still six months? I don't remember. Let's say you're in the six-month claim period, and you've got two days left of the claim period, and the bank says, okay, well, now we're going to substitute this loan and we're going to extend this loan out for, you know, five years, and we expect that Nardoni's estate is on the hook as a guarantor. So how do you close the estate if the loan is going to last five years and the claims period is up, but they've notified the executor that there's this condition, that the estate is on the hook for five years on this loan. How do you close the estate? The bank needs to file a claim within the prescribed claim period as it did here, and that's the amount of the bank's claim as of the date that the claims are cut off. That's the claim for purposes of the probate estate. The point is, let's say that the bank files a claim on the last day of the claim period, but the loan is not due. Well, let's say the loan is not due for five years, and you're saying the estate is on the hook for five years. So they can't close the estate. You've got to keep it open as long as the loan lasts. If there were a distribution pursuant to validly filed claims, then there would presumably be a distribution to the claimant, to the claimant bank. But it's not due yet. So that's the point that I think they're making. They're saying that you can just continually keep an estate on the hook for years by just extending it or recasting the loan or substituting the loan. You can just keep doing this. And what they're saying is, how are we ever going to close this estate if you do that? What I would say to you is, standard in this case, file the claim with the expectation that that's the amount of its claim against Mr. Nardone and against his estate. All right. Well, okay. You're not answering my question, right? I mean, we're not – the train's not meeting. Yeah. The point is that you might call it a claim, but it's not due an owing yet. It's just a guarantee. Okay? Let's say you extended the loan for five years, and you're saying that the estate of Nardone is on the hook as a guarantor for that loan, but the loan's not due yet. So the state doesn't have an obligation to pay on that guarantee yet because the loan's not due yet. Okay? So I don't see how you can close the estate. As long as that guarantee is out there, I don't see how you close the estate. Well, the independent – So you've got to keep the estate open for five years just in case the loan goes bad and you come to the estate on the basis of the guarantee. Am I missing something? I think there's a process within the probate process whereby that could be resolved. That's what I'll say. With regard to Kappa State, I took a look at the two cases that were cited. There's nothing in those cases with regard to the language of the guarantees. I think counsel indicated he thought there was. I was both listening to him and reading the cases, but I believe there's nothing there. That's the State Bank of East Moline case and the Mount Prospect State Bank case. In addition, I think the court should be troubled by the argument that the independent executor is making that this third guarantee, the guarantee of Mr. Duggan, was a significant issue to Mr. Nardone. Mr. Nardone was the president of Kappa State. Kappa State was borrowing $1 million. Kappa State took the money. This is not like State Bank of East Moline where you've got 13 limited partners and 12 of them signed in the 13th dozen. This isn't like Mount Prospect State Bank where there are, I think, 96 guarantors. This is one guarantor, and this guy is the president of the company. That loan was dispersed a year before he died. You shouldn't be able to play gotcha with $1 million. If you take the money and you sign the guarantee, the expectation should be that you're on the hook for that guarantee. And even the trial court found that the guarantee was valid. The trial court just found that it should be reduced, which we think it should. Finally, there is a case that cited the FDIC versus Manula case, which is in the briefs, but I did want to bring it to the court's attention with regard to the three-guarantor issue. In that case, the court found that the bank could waive obtaining the third guarantee. And with that, thank you very much for your time. We hope that you reverse. We think that the case law and the facts in this case dictate a reversal, whether it's for the grant of a summary judgment to standard or a remand. Thank you. Thank you, Counsel. On behalf of the court, I would express our thanks to each of the parties for their excellent presentations today and their briefing. It's a very interesting case, and we will take it under advisement. Court is adjourned. Thank you very much.